



## MEMORANDUM OPINION

No. 04-10-00701-CR
No. 04-10-00702-CR

### EX PARTE THOMAS CASTILLO

From the 227th Judicial District Court, Bexar County, Texas
Trial Court Nos. CM961566 & CM961565
Honorable Andrew Carruthers, Judge Presiding

Opinion by: Sandee Bryan Marion, Justice

Sitting: Sandee Bryan Marion, Justice
Rebecca Simmons, Justice
Marialyn Barnard, Justice

Delivered and Filed: December 22, 2010

AFFIRMED

This is an accelerated appeal from the trial court's decision on appellant's application for writ of habeas corpus seeking a reduction in bail. We affirm the trial court's order.

### BACKGROUND

Appellant, Thomas Castillo, was charged with capital murder and burglary of a habitation. When bail was originally set for $1 million on each charge, appellant filed his application seeking a bail reduction. Following an evidentiary hearing, the trial court lowered the bail on the capital murder charge to $500,000 and on the burglary of a habitation charge to $50,000. On appeal, appellant asserts the trial court erred in setting an excessive bail on both

charges, and such error violated his constitutional right to have bail set at an amount reasonably calculated to assure his presence at trial.

## DISCUSSION

"The primary purpose or object of an appearance bond is to secure the presence of a defendant in court for the trial of the offense charged." *Ex parte Rodriguez*, 595 S.W.2d 549, 550 (Tex. Crim. App. 1980). Bail should not be set so high as to be oppressive, but should be high enough to provide reasonable assurance the defendant will appear at trial. *Ex parte Ivey*, 594 S.W.2d 98, 99 (Tex. Crim. App. 1980). Bail operates to balance the "presumption of innocence of the accused and the compelling interest of the State that the accused appear to answer the accusation against him." *Balboa v. State*, 612 S.W.2d 553, 557 (Tex. Crim. App. 1981) (Clinton, J., dissenting/concurring in part). Nevertheless, the burden of proof is on the defendant to show the bail is excessive. *Rodriguez*, 595 S.W.2d at 550.

In claiming that the amount of bail in this case was oppressively high, appellant cites to several older cases involving different offenses in which the reviewing court reduced the bail amount to less than $100,000 after finding that the trial court's bail amount was excessive; while the State points to more recent cases for its argument that there is a trend towards higher bail amounts. However, "'[c]ase law is of relatively little value in addressing the ultimate question of the appropriate amount of bail in a particular case' because appellate decisions on bail matters are often brief and avoid extended discussions, and because the 'cases are so individualized that generalization from results reached in others is difficult.'" *Ex parte Beard*, 92 S.W.3d 566, 571 (Tex. App.—Austin 2002, pet. ref'd) (internal citation omitted). Therefore, we look first to the statutory rules that guide a bail determination.

The amount of bail required in any case is within the discretion of the court, judge, magistrate, or officer taking the bail, subject to the following rules:

> 1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.
> 2. The power to require bail is not to be so used as to make it an instrument of oppression.
> 3. The nature of the offense and the circumstances under which it was committed are to be considered.
> 4. The ability to make bail is to be regarded, and proof may be taken upon this point.
> 5. The future safety of a victim of the alleged offense and the community shall be considered.

TEX. CODE CRIM. PROC. ANN. art. 17.15 (West 2005). In addition, the following factors may also be considered: the accused's work record, family and community ties, length of residency, prior criminal record (if any), and any aggravating circumstances alleged to have been involved in the offense the accused is charged with committing. *Ex parte Rubac*, 611 S.W.2d 848, 849-50 (Tex. Crim. App. 1981).

## 1.      Nature of Offenses

The State alleged[1] appellant broke into the house of Rojelio Nava, who was the boyfriend of appellant's estranged wife Carol Sanchez. Appellant watched as Nava and Carol entered the house, at which time he stabbed both of them. Nava died from multiple stab wounds to the back of his head and his back. Carol, who survived the attack, was stabbed ten times. The punishment for capital murder is life in prison or death. TEX. PENAL CODE ANN. § 12.31(a) (West Supp. 2010). Because appellant faces life without parole or the death penalty on the capital murder charge, the motivation to flee is a factor warranting a high bond. The trial court

---

[1] The State's evidence was derived primarily from an investigative report that contained allegations which may not necessarily be admissible in a criminal trial. *See* TEX. R. EVID. 101(d)(1)(E) (Texas Rules of Evidence do not apply in a hearing to lower bail). However, for the purpose of setting bail, the trial court considered the evidence; and for the purpose of this opinion, we recite the allegations contained in the report.

may have concluded that the bond set was reasonable based on the seriousness of the offenses and the severity of the potential punishment.

**2.     Future Safety of Carol and the Community**

Although present in the courtroom, Carol did not testify at the hearing.   Her sister testified, and when asked her feelings about appellant getting out on bond, she responded that she did not want him out "because [she] knew [appellant] since the day that my sister and [he] got together."   She also said her family was "devastated."

The investigative report states Carol and appellant had been married for nine years, but had known each other for fourteen years.   They separated in May 2010.   During the separation, Carol met Nava, the two began an intimate relationship, and Carol moved into Nava's home.   In June 2010, Carol decided to move back in with appellant and appellant helped her move her possessions out of Nava's house.   According to the investigative report, this provided appellant with access to the layout of the house.   In July 2010, Carol decided to move back into Nava's home.   While appellant was not home, Carol called a friend to help her move her possessions, but appellant arrived home and confronted Carol.   According to the report, appellant grabbed a box cutter and threatened to cut Carol's face if she left.   After arguing, appellant slashed two sofas and left the house when Carol called the police.   On August 14, 2010, the couple again met, this time at their son's baseball banquet.   As Carol was leaving the banquet, appellant grabbed her arm and allegedly said "I'm going to kill you."   On August 15, 2010, appellant allegedly stabbed and killed Nava and stabbed Carol ten times.   The trial court may have concluded that the bond set was reasonable based on Carol's continued vulnerability to attack.

### 3.    Ability to Make Bail

Appellant's mother, Thelma Castillo, said he would live with her if he were released on bail.   Castillo, who has appellant's power of attorney and was familiar with his finances, continues to make the mortgage payments on the house owned by appellant and Carol, but she said they were in danger of foreclosure because she is one month behind on the payments.  The house is valued at $64,500, but $46,194 is still owed on the mortgage.  Appellant's mother has looked into selling the house, with an offer at $70,000, but only about $24,000 would come to appellant and Carol.  Nothing indicates Carol would agree to the sale of the house and she has taken all the furniture in the house.  Appellant has one bank account with a balance of five dollars; he has no credit cards; he owns stock through his employer but he cannot access the stock until three years after he leaves his employment; and his 401K has an approximate balance of $4,000.  He owns two vehicles, a 1998 truck that he drove and a 2007 Equinox driven by and in the possession of Sanchez.  The truck has only a "salvage title."  Appellant's mother has contacted three bonding companies, each of which told her they would require ten percent of the bond plus collateral.  Appellant's parents have nothing to contribute towards the ten percent because she and her husband live paycheck-to-paycheck.  Each of appellant's sisters could contribute $5,000.

An accused's ability to make bond is one factor to be considered in determining the appropriate amount of bail.  TEX. CODE CRIM. PROC. ANN. art. 17.15(4); *Ex parte Brown*, 959 S.W.2d 369, 372 (Tex. App.—Fort Worth 1998, no pet.).  An accused's inability to secure bond for the bail set by the trial court does not automatically render the bail excessive.  *Brown*, 959 S.W.2d at 372.  Here, appellant provided evidence supporting his claimed inability to make bail

in the amount of $550,000 and evidence regarding his mother's unsuccessful efforts to secure bond.

## 4.    Other Factors

Appellant is thirty years old, was born in San Antonio, and has lived here his entire life. He does not have a passport and has never been out of the country. Appellant graduated from the same high school as his mother, who is a bailiff employed by the Bexar County Sheriff's Department. Appellant's mother and father both live in San Antonio, and have been married for thirty-two years. Appellant's father is disabled. Appellant has two sisters, both a few years younger than him; both are married and live in San Antonio. One of his sisters is also a bailiff with the Bexar County Sheriff's Department, and she is married to a Bexar County Sheriff's Department detention officer. The alleged offenses occurred around 2:55 a.m. on August 15, 2010. Appellant fled to Corpus Christi. After his mother was notified of the offenses by a detective, she located her son in Corpus Christi and drove there to get him. They drove straight to the Bexar County jail where appellant turned himself in the same day at 1:45 p.m. Appellant's mother said appellant had no family in Corpus Christi.

At the time of his arrest, appellant and Carol had owned their home for ten years, which is where appellant lived until his arrest. They have three children, all under the age of twelve. The children lived with appellant until about three months before his arrest, and then lived with their mother and Nava. Appellant did not testify, but his mother described his relationship with his children as very close, stating he is actively involved with his children's school and he coached for the Pop Warner organization and the children's various activities. Appellant has worked for the same employer for about eleven years as a painter and journeyman, earning $15.75 per hour. Appellant's mother said she has eleven siblings, all of whom live in San

Antonio, and appellant has thirty-two cousins. She described the family ties as "close." Appellant has never been arrested or convicted for any offense, and has never belonged to a gang.

The safety supervisor for appellant's employer testified appellant supervised the company's paint shop and he would see appellant almost every day, two to four times a day. He described appellant as "consistent with his job," which included working in a building that was not air-conditioned. He said appellant would work all day in the shop, the temperature in which could reach 100 degrees, and then leave to assist in coaching his sons' baseball games. He also described appellant as "quiet, soft spoken." He said he would be surprised by the allegations that appellant stabbed a man to death and stabbed his estranged wife. Another co-worker, who has known appellant for sixteen years and worked with him for eleven years, described appellant as dependable and a great dad. He believed appellant would show up for court as necessary because of appellant's work ethic and because appellant was always at work when he was needed.

Sandra Pacheco, who lived next door to appellant for eleven years, did not believe appellant was dangerous to anyone, and she described appellant as family-oriented because he was always with his children when he got home from work and he was involved with the boys' sports and his daughter's cheerleading. She had no doubt appellant would return to court as necessary if he were released from jail. She did not know appellant had fled to Corpus Christi the night of the alleged offenses until the State asked her on cross-examination. However, on re-direct, when she was told he voluntarily turned himself in the next day, she said, "he's the person that would do that."

**CONCLUSION**

After hearing all the evidence, the trial court reduced bail, from $1 million on each charge, to $500,000 on the capital murder charge and $50,000 on the burglary charge. We must review a trial court's ruling on the setting of bail under an abuse of discretion standard of review. *See Rubac*, 611 S.W.2d at 850. Reviewing all the above factors in light of the standard of review, we cannot say the trial court abused its discretion in setting the amount of bail as it did; and therefore, the trial court did not violate appellant's constitutional rights. Therefore, we overrule appellant's issues on appeal and affirm the trial court's judgment.

Sandee Bryan Marion, Justice

Do not publish